1

**POMERANTZ LLP**

2
Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com

3
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com

4
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024

5
Telephone: (310) 432-8492

6

**THE LAW OFFICE OF ROBERT L. STARR**

7
Robert L. Starr, State Bar No. 183052
robert@starrlaw.com

8
23901 Calabasas Road, Suite 2072
Calabasas, CA 91302

9

*Attorneys for Plaintiff*

10

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA**

13

14
GRETCHEN KEY, an individual, on behalf of herself and others similarly situated,

15
                                    Plaintiff,

16
                            vs.

17
BMW OF NORTH AMERICA, LLC, a limited liability company, and DOES 1 through 10, inclusive,

18

19

20
                                    Defendants.

21

Case No. 3:19-CV-03366-MMC

<u>CLASS ACTION</u>

**FIRST AMENDED COMPLAINT FOR:**

1. **VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.;* AND**

2. **CONVERSION**

<u>DEMAND FOR JURY TRIAL</u>

22

23

24

25

26

27

28

1      Plaintiff Gretchen Key ("Plaintiff"), individually and on behalf of all other members of

2 the public similarly situated, brings this action against Defendant BMW of North America, LLC

3 ("Defendant" or "BMW"), upon information and belief, except as to her own actions, the

4 investigation of her counsel, and the facts that are a matter of public record, and alleges as

5 follows:

6                                 **INTRODUCTION**

7       1.      This consumer class action arises out of BMW's failure to make vehicle

8 diagnostic information available to BMW car owners.  Car owners require, and are entitled, to

9 this information to repair their vehicles without incurring unnecessary out of pocket costs.

10       2.      As further alleged below, Plaintiff's experience proves this point.  Plaintiff took

11 her vehicle into a BMW authorized repair facility, Weatherford BMW, pursuant to a safety

12 recall, to fix a problem with the vehicle's doors.  On information and belief, during the recall,

13 Weatherford BMW accessed and extracted diagnostic data from Plaintiff's vehicle and provided

14 that information to BMW in New Jersey or to another central BMW location. After the recall

15 work was performed, Plaintiff experienced a series of additional problems with the vehicle.

16 Although Weatherford BMW and BMW initially did pay for some of the repair work necessary,

17 Weatherford BMW eventually denied that all of the problems that stemmed from the safety

18 recall repair were caused by Weatherford BMW and/or caused by the recall work performed,

19 and refused to repair the problems.  Because BMW refuses to provide the diagnostic data that

20 would establish that the problems arose while the vehicle was being repaired by Weatherford

21 BMW, Plaintiff had to pay $1,997.52 out of pocket for the repairs.

22       3.      Moreover, after the problems arose following BMW's safety recall repair,

23 Plaintiff attempted to have the problems diagnosed and repaired at an independent, non-BMW

24 authorized repair facility.  However, because BMW also does not make all of the diagnostic data

25 contained in the vehicle available to independent repair facilities, the independent repair facility

26 also was unable to diagnose the problems or repair Plaintiff's vehicle.

27       4.      Plaintiff's experience is not unique. When customers request that BMW provide

28 the data gathered using the various diagnostic tools described below, BMW refuses to provide

FIRST AMENDED COMPLAINT

the data to customers.  BMW also does not provide the data to independent repair facilities. BMW does not even share all of the data with BMW's own franchise or factory authorized repair facilities.

5.      This course of conduct is harmful to consumers because it prevents consumers from being able to independently determine if certain malfunctions and defects should be covered under BMW's factory warranty, or if certain malfunctions and defects were caused by a servicing dealership.

6.      Further, in refusing to make the diagnostic data available to independent repair facilities, BMW effectively is forcing customers to take their vehicles to a BMW authorized repair facility.

7.      BMW's conduct is unfair and illegal in violation of California's unfair business practices statute, California Business and Professions Code section 17200, *et seq.* (the "UCL").

**BACKGROUND**

8.      BMW is known for manufacturing and distributing vehicles ("BMW Vehicles") that are on the cutting edge of technology. Dating back to at least 2008, BMW Vehicles have been equipped with onboard diagnostic and data gathering equipment. This equipment gathers data from numerous data points and sensors in BMW Vehicles.

9.      BMW has developed and distributed to its dealerships diagnostic software and vehicle interface equipment ("Diagnostic Tools"). The Diagnostic Tools are used by BMW dealerships to extract data from BMW Vehicles. The data is used for a variety of different purposes, primarily associated with diagnosing the root cause of vehicle malfunctions and vehicle defects.

10.     Once the data is extracted from the BMW Vehicles using the Diagnostic Tools, BMW makes some of the data available for review by the servicing BMW dealership; however, the servicing BMW dealership is restricted from seeing all of the data. All of the data, once gathered at the dealership with the Diagnostic Tools, is forwarded by the Diagnostic Tools to BMW.  BMW collects and archives the data that it receives. The data is very useful because it contains information indicating when a particular malfunction or defect is first detected, under

what environmental condition a particular malfunction or defect is detected, and often provides information about the reason a particular malfunction or defect has been detected. This information is extremely valuable for many reasons because it can indicate whether a particular malfunction or defect was first detected during the term of a BMW Vehicle's factory warranty, whether a particular malfunction or defect should be covered under the factory warranty, and whether a particular malfunction or defect occurred as a result of negligent or wrongful conduct on the part of a servicing dealership.

11.    BMW is acutely aware of the value of the data and has gone to great lengths to develop cutting-edge technology to gather as much data as possible regarding BMW Vehicle performance and the various environmental influences that can affect BMW Vehicle performance. Unfortunately, BMW has also gone to great lengths to prevent its customers and, to some extent, even the servicing dealerships from having access to the data. Concealing the data from customers is harmful to customers because it prevents them from being able to have transparency with regard to automotive repairs, prevents them from being able to determine if they should have to pay for repairs, and prevents them from being able to determine if they are being treated fairly, both by BMW and by BMW's servicing dealerships.

12.    Various California statutes also require BMW to make diagnostic data available. Some of these laws were established many years ago when data gathering and diagnosis was in its primitive stage. Subsequently, automobile manufacturers have developed significant innovations regarding onboard diagnostics and data gathering. But even dating back to when these laws were enacted, lawmakers understood the importance of transparency regarding the diagnosis of vehicle malfunctions and defects, including the causes thereof.

13.    For example, California Code of Regulations section 3356(a)(2)(A) provides that a customer's repair invoice must describe and identify all service and repair work performed, including all diagnostic and warranty work. California Business and Professions Code section 9884.8 provides that a copy of a customer's invoice, including the diagnosis, must be maintained for three years.

14.    Further, a customer's diagnostic data is part of a customer's warranty repair record.  In failing to provide this information, BMW also expressly violates California Code of Regulations section 3356(a)(c)(1) which provides that a customer repair invoice must describe and identify "any diagnosis." California Business and Professions Code section 9884.8 provides that a copy of the invoice, including the diagnosis, must be maintained by servicing dealerships for three years. BMW's conduct in preventing its servicing dealerships from seeing all of the data actually prevents its servicing dealerships from complying with California Business and Professions Code section 9884.8. This is because BMW prevents its dealerships from having access to all of the diagnostic data. Thus, the servicing dealerships cannot keep all diagnostic data for three years and cannot fully and completely describe all diagnostic work performed. At best, in some instances, the dealership is limited to just describing the conclusions reached with regard to what work to do.  As a result of BMW's failure to provide its customers and dealerships with access to all of the diagnostic data BMW collects, the servicing dealerships do not comply with California Business and Professions Code section 9884.8.

15.    California Health & Safety Code section 43105.5 also requires that, if a problem exists that could cause a vehicle to fail a smog test, the manufacturer must make the diagnostic data available by offering repair facilities the emissions-related diagnostic tools necessary to diagnose the problem.

16.    Notwithstanding the need and justification for BMW Vehicle data transparency, BMW refuses to make available or provide customers with the information gathered using the Diagnostic Tools.   This information includes: (i) reports relating to the diagnostic testing; (ii) information regarding self-healing codes; (iii) FASTA data, which is BMW's process for vehicle operating and service data transfer and analysis; (iv) ISTA (Integrated Service Technical Application) reports, which is BMW's diagnostic and reprogramming software; and/or (v) other operational reports relating to the diagnostic work or the repair work performed.

17.    Furthermore, when customers request that BMW provide the data gathered using the Diagnostic Tools, BMW refuses to provide the data to customers. What legitimate reason

FIRST AMENDED COMPLAINT

would BMW have for preventing its customers from having access to customers' own vehicle data that BMW already gathers and maintains?

**JURISDICTION AND VENUE**

18.    This Court has removal jurisdiction over this action pursuant to 28 U.S.C. § 1441 and § 1332(d)(2)(A).  Members of the Class are citizens of a state different from that of Defendant BMW, and aggregating the claims of individual Class members, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. Further, 28 U.S.C. § 1332(d)(5) does not apply because: (i) BMW is not a state, state official, or other governmental entity against whom the Court may be foreclosed from ordering relief; and (ii) the number of members of the Class in the aggregate exceeds 100.

19.    This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with California, having intentionally availed itself of the California market so as to render the exercise of jurisdiction over it by this District Court consistent with traditional notions of fair play and substantial justice. Further, by removing this action, Defendant concedes personal jurisdiction.

20.    Defendant has removed this action to this venue.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant conducts business within the State of California, has failed to designate with the office of the California Secretary of State a principal place of business in California, and a substantial part of the events giving rise to the claims alleged herein occurred in this District.

**PARTIES**

21.    Plaintiff Gretchen Key ("Plaintiff") is, and at all times relevant hereto has been, a resident and citizen of the State of California.

22.    Defendant BMW of North America, LLC ("Defendant" or "BMW") was and is, upon information and belief, a New Jersey limited liability company doing business in California.

23.    The true names and capacities of Defendants sued in this Complaint as Does 1 through 10, inclusive, are currently unknown to Plaintiff, and therefore Plaintiff sues such

FIRST AMENDED COMPLAINT

1    Defendants by such fictitious names.  Plaintiff will amend this Complaint to reflect the true

2    names and capacities of the Defendants designated herein as Does 1 through 10, when they have

3    been ascertained, along with the appropriate charging allegations, as may be necessary.

4         24.     Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 10

5    were the partners, agents, owners, shareholders, managers or employees of BMW at all relevant

6    times.

7         25.     Plaintiff is informed and believes, and on that basis alleges, that each of the

8    fictitiously named Defendants was in some manner legally responsible for the actionable and

9    unlawful actions, policies and practices as alleged herein.  Plaintiff will amend this Complaint to

10   set forth the true names and capacities of said Defendants, along with the appropriate charging

11   allegations, when the same have been ascertained.  Each reference in this Complaint to "BMW"

12   or "Defendant" is also a reference to all Defendants sued as Does 1 through 10.

13   **BMW'S CONDUCT**

14        26.     When a customer brings in a BMW Vehicle for repair at a BMW dealership, the

15   BMW dealership uses Diagnostic Tools to extract data from the BMW Vehicle. This is often

16   done to determine the source of a malfunction or defect. Among other things, the data contains

17   all of the stored and active fault codes which are stored in the BMW Vehicle at the time of the

18   data extraction. The data is not provided to the customer. Furthermore, oftentimes fault codes

19   are extracted that do not relate to a customer's current complaints but alert the reader of the data

20   that the BMW Vehicle may have a malfunction or defect.

21        27.     BMW has a policy and practice of concealing fault codes from the customer if

22   the fault codes that are extracted do not relate to a current customer complaint, and no further

23   investigation is done to determine if there is a malfunction or defect relating to the fault codes.

24   This policy exists in order to reduce the amount of money that is spent by BMW for warranty-

25   related repairs.

26        28.     Furthermore, on information and belief, when a repair is performed under

27   warranty, after the data is extracted and the repairs are completed, the BMW servicing

28   dealership deletes all of the BMW Vehicle's fault codes, not just the fault code for the specific

repair. Thus, if any problem identified by said deleted fault codes manifests at a later time, the customer cannot track when the problem first appeared in the data. As a result, if a problem manifests after the warranty has expired, there will be no way for the customer, or even the dealership, to know that the problem arose during the warranty period and should be covered under warranty. BMW specifically does not identify those repairs/fault codes so that BMW can charge customers later for those additional repairs after the initial repair is made, or when the problem manifests after the warranty period.

29.     BMW realizes that the data is important and goes to great lengths to gather and archive the data. But BMW conceals the data from the customer, thus preventing the customer from being able to know when problems with a vehicle were first detected.

30.     Moreover, some of the BMW Vehicle data that is obtained by BMW is not even made available to BMW's own servicing dealerships.

31.     BMW collects said data but refuses to provide that information to customers, even when customers request the data.

32.     The data BMW extracts from a customer's BMW Vehicle belongs to the customer, and the customer is entitled to that data. The data requested is instrumental in diagnosing vehicle malfunctions and defects, including but not limited to problems that affect vehicle safety. BMW is in possession of that data and must make it readily available to customers; however, BMW refuses to voluntarily do so, and refuses to do so even when requested.

33.      As further alleged in detail below, Plaintiff, who has lost money or property as a result of Defendant's unfair business practice, seeks to prohibit ongoing unlawful acts that threaten future injury to the car-buying public at large.

34.     Plaintiff reserves the right to expand, limit, modify, or amend these allegations at any time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

**PLAINTIFF'S EXPERIENCE**

35.     Plaintiff owns a 2008 BMW 750LI.

36.     In December 2017, BMW published a safety recall relating to the 2008 BMW 750LI, recall number 17V-328, and offered to fix a problem with the electric door latch which could cause the latch to unexpectedly open while driving.

37.     On July 31, 2018, at 116,820 miles, Plaintiff took her vehicle to Weatherford BMW of Berkeley, a BMW authorized repair facility, in order to have her vehicle undergo the repairs set forth in the recall. Weatherford BMW performed the work described in recall number 17V-328. This work included programming of the vehicle.

38.     On August 8, 2018, at 116,985 miles, Plaintiff took her vehicle back to Weatherford BMW complaining of damage (specifically, problems with the airbag light and driver's side power window) caused to the vehicle as a result of the recall work being performed. The repair record relating to the repair attempt conducted at 116,985 miles indicated that a short test was run, fault codes were extracted, programming was performed, the fault memory was cleared, and the vehicle's operation was checked.  Essentially, data was extracted.

39.     On September 5, 2018, at 119,229 miles, Plaintiff took her vehicle back to Weatherford BMW complaining of further damage (specifically, problems with the door brakes) caused to the vehicle due to the recall related repairs. A functional test plan was performed, a test procedure was performed, and data was again extracted.

40.     On December 18, 2018, at 130,998 miles, Plaintiff again took her vehicle back to Weatherford BMW complaining of damage (specifically, problems with the door locks) caused to the vehicle as a result of the recall work being performed.  Weatherford BMW performed certain repairs relating to the original recall repair work and that were covered under the warranty for the recall repair.  Plaintiff retrieved her car from Weatherford BMW on December 20, 2018.

41.     The very next day, on December 21, 2018, Plaintiff took her vehicle back to Weatherford BMW complaining of further damage (specifically, light switch and sensor faults and front and rear sides) caused to the vehicle due to the original recall repairs and/or due to the repairs performed by Weatherford BMW the day before). Essentially Plaintiff alleged that the problems with the vehicle on December 21, 2018 were the result of the repair work performed

1    by Weatherford BMW. A functional test plan was performed, a test procedure was performed,

2    and data was again extracted.

3         42.    In sum, diagnostic tests were performed and data was extracted from Plaintiff's

4    vehicle on at least four occasions.  At no time was Plaintiff provided with any data extracted

5    from Plaintiff's vehicle, including reports relating to the diagnostic testing, the self-healing fault

6    codes that were present, any FASTA data, any ISTA reports, any key data reports codes, or any

7    operational reports relating to the diagnostic work or repair work performed on Plaintiff's

8    vehicle.

9         43.    It is Plaintiff's belief that while Plaintiff's vehicle was at Weatherford BMW,

10   Weatherford BMW damaged Plaintiff's vehicle, and she so notified the facility.  Weatherford

11   BMW denied having caused any damage to Plaintiff's vehicle while the vehicle was at

12   Weatherford BMW, and thus Weatherford BMW refused to pay for the repairs to the vehicle.

13   As a result, Plaintiff was forced to pay for repairs to the vehicle.

14        44.    On March 14, 2019, Plaintiff, through her counsel, requested in writing that

15   BMW provide Plaintiff with the data that BMW is in possession of relating to Plaintiff's

16   vehicle. BMW refused, stating that "a demand for production or a subpoena for production may

17   only be issued in connection with pending litigation."  Thus, any claim by BMW that Plaintiff's

18   lawsuit is unjustified or unnecessary to obtain the requested data is disingenuous and inaccurate.

19        45.    Plaintiff then took her vehicle to an independent repair facility, A&E Automotive

20   Sales, Inc.  However, BMW also does not allow independent repair facilities to access all of the

21   vehicle diagnostic data.  Because the independent facility also was not able to access the

22   vehicle's data, the facility was unable to diagnose or repair the vehicle.

23        46.    Since BMW restricts even servicing dealerships from having access to all of the

24   diagnostic data, consumers are forced to take vehicles to BMW franchise dealerships for repairs,

25   even outside of the warranty.

26        47.    Plaintiff then took her vehicle to Concord BMW, a BMW factory authorized

27   repair facility, on May 3, 2019, which identified a variety of electrical and other problems.

28

FIRST AMENDED COMPLAINT

1    Concord BMW ultimately performed repairs to Plaintiff's vehicle and charged Plaintiff

2    $1,997.52 for the repairs, which she paid.

3        48.    While the vehicle was at Concord BMW, data again was extracted from

4    Plaintiff's vehicle.  Plaintiff believes that the repairs were attributable to the recall work

5    performed by Weatherford BMW and that the diagnostic information will confirm that.

6        49.    On information and belief, Concord BMW was finally able to diagnose the

7    problems with her vehicle only because the problem was elevated by Concord BMW to BMW's

8    national engineers who *do* have access to data extracted from Plaintiff's vehicle and stored in

9    BMW's databases.  Franchise dealerships, when scanning vehicles for fault codes, forward the

10   data extracted from the BMW Vehicles to BMW.  When franchise dealerships encounter

11   difficulty in diagnosing problems, as a tool available to franchise dealers, the franchise

12   dealerships can speak with BMW engineers, who can look at all of the data and assist in

13   diagnosing what is wrong with a vehicle.

14       50.    The data extracted from Plaintiff's vehicle during the various repairs can reveal

15   when the fault codes relating to the further damage were first detected, that Weatherford BMW

16   caused the further damage to Plaintiff's vehicle, and whether the further damage was caused

17   while Plaintiff's BMW Vehicle was under warranty. If the fault codes were first detected while

18   the vehicle was being serviced by Weatherford BMW, Plaintiff would be able to prove that

19   Weatherford BMW caused the further damage while her BMW Vehicle was under warranty and

20   Plaintiff would be able to compel Weatherford BMW, if necessary by legal action, to pay for the

21   expenses associated with repairing said further damage.

22       51.    However, at no time was Plaintiff provided with any reports relating to the

23   diagnostic testing, the self-healing fault codes that were present, any FASTA data, any ISTA

24   reports, any key data reports codes, or any operational reports relating to the diagnostic work or

25   repair work performed on Plaintiff's vehicle.

26       52.    BMW is in possession of Plaintiff's data, which she has a right to, and refuses to

27   produce it.

28

53.    As a result of BMW's conduct, Plaintiff has lost money or property and has suffered damage. The data extracted from Plaintiff's vehicle belongs to her and is worth money. Plaintiff has a right to that data.  Car manufacturers are not entitled to use this data for free, especially when the data is not provided to consumers.

54.    In addition, Plaintiff paid $1,997.52 out of pocket to fix the problems with her vehicle that she alleges were caused by Weatherford BMW as a result of the original recall.  It is Plaintiff's information and belief that data extracted from Plaintiff's vehicle will prove that the damage to the vehicle occurred while it was in Weatherford BMW's possession and as the result of Weatherford BMW's conduct.  This information is the only way to establish what in fact occurred.  Thus, BMW's refusal to provide the data has caused or contributed to, in whole or in part, Plaintiff having to pay $1,997.52 to repair her vehicle.  The amount of damage attributable to BMW, as opposed to the repair facility, can be determined at trial.

55.    Moreover, as BMW has refused to produce this information, Plaintiff has had to file a lawsuit in order to obtain the diagnostic data.

56.    Plaintiff's harm is continuing.  Plaintiff's vehicle continues to experience problems that Plaintiff attributes to the original recall repair.  Therefore, Plaintiff has a continuing need to obtain the diagnostic and data information that BMW refuses to make available.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff re-alleges and incorporates by reference each allegation set forth above.

58.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3) on behalf of herself and members of the Class as defined below.

59.    Excluded from the Class are Defendant, and its subsidiaries and affiliates; its current and former officers, directors, and employees (and members of their immediate families); and the legal representatives, heirs, successors or assigns of any of the foregoing.

60.    All claims alleged herein arise under California law for which Plaintiff seeks relief authorized by California law.

61.    Plaintiff's proposed class consists of and is defined as follows:

All persons who own or lease BMW Vehicles and, within four years prior to the filing of the Complaint until the date of trial, had diagnostic tests performed on their BMW Vehicles in the State of California, by or on behalf of BMW, including at any BMW dealership (the "Class").

62.    Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

63.    As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are common questions of law and fact as to Class members that predominate over questions affecting only individual members, including, but not limited to:

(a)    Whether Defendant fails to provide Class members with all of the data relating to Class members' vehicles, including, but not limited to, "fault tests" or similar reports relating to the diagnostic testing of their vehicles, self-healing codes, FASTA data, ISTA reports or other operational reports relating to the diagnostic work and repair work performed by BMW dealerships for Class members;

(b)    Whether BMW instructs its dealers or others acting on its behalf to conceal fault codes and data from Class members, and to make only those repairs associated with customer complaints, even though fault codes relating to other potential malfunctions and defects have been detected;

(c)    Whether when a repair is performed under warranty, BMW instructs its servicing dealerships to delete all of the fault codes at the servicing dealership for the vehicle (not just the fault code for the specific repair) after a repair is made;

(d)    Whether, when vehicle maintenance issues identified by fault tests manifest at a later time, the BMW servicing dealership's prior deletion of fault codes prevents Class members from tracking when a problem was first detected on a fault test and therefore, either prevents Class members from contending that the problem arose during the warranty period and should be covered under warranty, or prevents Class members from

contending that BMW caused the problem and should cover the cost of repair;

(e)  Whether BMW's conduct prevents Class members from knowing about the additional problems with their vehicles identified by fault tests, which could be addressed and repaired, particularly when the vehicle is still under warranty;

(f)  Whether BMW collects Class members' vehicle data, including but not limited to diagnostic data and FASTA data, but refuses to provide that information to Class members, even when they request it;

(g)  Whether BMW engaged in unlawful and unfair business practices in violation of California Business & Professions Code section 17200, *et seq.*;

(h)  Whether BMW's conduct constituted conversion;

(i)  Whether Plaintiff and Class members are entitled to injunctive relief; and,

(j)  The appropriate amount of restitution or monetary penalties resulting from BMW's violations of California law.

64.  Numerosity:  As required by Fed. R. Civ. P. 23(a)(1), the Class members are so numerous that joinder of all Class members would be unfeasible and impractical.  The membership of the entire Class is unknown to Plaintiff at this time; however, the Class is estimated to be greater than one hundred (100) individuals and the identity of such membership is readily ascertainable by inspection of Defendant's records.

65.  Typicality:  As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of all members of Class since Plaintiff and all members of the Class suffered damages as result of Defendant's wrongful conduct set forth herein.

66.  Adequacy:  As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class and has retained counsel competent and experienced in class

1   action litigation who will zealously prosecute this matter to its conclusion on behalf of the

2   Class.

3       67.    Superiority:  As required by Fed. R. Civ. P. 23(b)(3), the nature of this action

4   makes the use of class action adjudication superior to other methods.  A class action will

5   achieve economies of time, effort, and expense as compared with separate lawsuits, and will

6   avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and

7   at the same time for the entire Class.

8       68.    Defendant keeps extensive computerized records of its customers.  Defendant has

9   one or more databases through which a significant majority of Class members may be identified

10  and ascertained, and it maintains contact information, including email and home mailing

11  addresses, through which notice of this action could be disseminated in accordance with due

12  process requirements.

13      69.    Class certification of Plaintiff's claims is also appropriate pursuant to Fed. R.

14  Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable

15  to Plaintiff and the Class, making appropriate both declaratory and injunctive relief with respect

16  to Plaintiff and the Class.

**FIRST CLAIM FOR RELIEF**

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

20      70.    Plaintiff re-alleges and incorporates by reference each allegation set forth above.

21      71.    California Business and Professions Code section 17200, *et seq*. (the "UCL")

22  prohibits "any unlawful, unfair or fraudulent business act or practice."  Defendant has

23  committed acts of unfair competition proscribed by the UCL, including the acts and practices

24  alleged herein.

25      72.    The UCL imposes strict liability.  Plaintiff need not prove that Defendant

26  intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – only

27  that such practices occurred.

28

FIRST AMENDED COMPLAINT

73.     BMW is a "person" as defined by California Business & Professions Code section 17201.

74.     As a direct and proximate result of Defendant's acts and practices in violation of the UCL, Plaintiff has suffered injury in fact and lost money or property as set forth above and will continue to do so.

Unfair Prong

75.     BMW's conduct violates the unfair prong of the UCL.

76.     An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided.  An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.   BMW's conduct violates all of these definitions.

77.     Without the diagnostic data, consumers are unable to independently determine if certain malfunctions and defects should be covered under BMW's factory warranty, or if certain malfunctions and defects were caused by a servicing dealership.  Further, in refusing to make the diagnostic data available to independent repair facilities, BMW effectively is forcing customers to take their vehicles to a BMW authorized repair facility.  This conduct does not benefit consumers or competition and is not an injury that consumers themselves could easily have avoided.

78.     Further, the information requested by Plaintiff and the Class is in the exclusive control of BMW and cannot otherwise be obtained by Plaintiff and the Class or even by repair facilities.  The information is material.  BMW has withheld information that a consumer seeking to repair his/her vehicle requires in order to, *inter alia*, determine if a vehicle's repairs are justified, confirm that the vehicle is being repaired properly, determine if certain malfunctions and defects should be covered under BMW's factory warranty, and/or determine if certain malfunctions and defects were caused by a servicing dealership.  The information is critical to a

FIRST AMENDED COMPLAINT

1   vehicle's function and repair and to its proper and effective ongoing operability. BMW's failure

2   to disclose the requested data goes to the core functionality of Plaintiff's and Class members'

3   vehicles. A vehicle cannot be properly diagnosed or repaired or perform without the

4   information that BMW collects from a vehicle but fails to provide. BMW's conduct also

5   prevents Plaintiff and Class members from seeing the only evidence that can establish disputed

6   claims and/or determine if certain malfunctions and defects should be covered under BMW's

7   factory warranty, or if certain malfunctions and defects were caused by a servicing dealership,

8   which is unethical, oppressive and unscrupulous.

9          79.    To the extent that any definition of "unfair" requires a balancing test or weighing

10  various factors, such an inquiry is fact intensive and requires a full factual record as to

11  Defendant's justification and motives for its conduct, and to the impact of Defendant's conduct

12  on Plaintiff and Class members.

13         80.    BMW's conduct as alleged also is unfair in that Plaintiff's claims are "tethered"

14  to a specific constitutional, statutory or regulatory provision, namely California's Auto Repair

15  Act ("ARA") and the express policy underlying the ARA.

16         81.    While the ARA is directed to automotive dealers, not manufacturers, the policy

17  underlying the ARA applies equally, if not more so, to manufacturers, and especially so in this

18  case where the dealerships that repair the vehicles are authorized by BMW and under BMW's

19  control. The policy underlying the ARA is to "foster fair dealing and eliminate

20  misunderstandings in transactions involving automotive repairs." *See Parada v. Small Claims

21  Court*, 70 Cal. App. 3d 766, 768-69 (1977) ["The Automotive Repair Act (Bus. & Prof. Code, §

22  9880 et seq.) was enacted to "foster fair dealing, [and] to eliminate misunderstandings" (55

23  Ops.Cal.Atty.Gen. 276, 278) in transactions involving automotive repairs."]; *Vasquez v. SOLO

24  1 Kustomes, Inc*., 27 Cal. App. 5th 84 (2018) (Bus. & Prof. Code is a "comprehensive statutory

25  scheme regulating automotive repair dealers. The Automotive Repair Act was enacted in 1971

26  in response to widespread fraudulent practices in the automotive repair industry. Its purpose is

27  to foster fair dealing, and to eliminate misunderstandings' in transactions involving automotive

28  repairs"). California Business and Professions Code section 9884, which is part of the ARA,

1    further reinforces that underlying policy message by expressly stating that "protection of the

2    public shall be the highest priority for the Bureau of Automotive Repair in exercising its

3    licensing, regulatory, and disciplinary functions.   Whenever the protection of the public is

4    inconsistent with other interests sought to be promoted, the protection of the public shall be

5    paramount."

6            82.     In keeping with this policy of vehicle data transparency, the ARA's enabling

7    regulations and provisions require that customers be made aware of all service and work

8    performed and all vehicle diagnoses and proposed repairs.   For example, California Code of

9    Regulations section 3356(a)(2)(A) provides that a customer's repair invoice must describe and

10   identify "all service and repair work performed, including *any diagnosis* or warranty repairs,

11   and the prices for each."  Emphasis added.

12           83.     Similarly, California Business and Professions Code section 9884.8 provides that

13   a copy of a customer's invoice, including the diagnosis, must be maintained for three years.

14   BMW's failure to provide its dealerships with access to all of the diagnostic data that BMW

15   collects precludes its servicing dealerships from keeping all diagnostic data for three years and

16   from fully and completely describing all diagnosis work performed. BMW's conduct in

17   preventing its servicing dealerships from seeing all of the data actually prevents its servicing

18   dealerships from complying with California Business and Professions Code section 9884.8.

19   This is because BMW prevents its dealerships from having access to all of the diagnostic data.

20   Thus, the servicing dealerships cannot keep all diagnostic data for three years.

21           84.     BMW's failure to provide diagnostic data precisely violates the ARA's policy of

22   fostering fair dealing and eliminating misunderstandings in transactions involving automotive

23   repairs and promoting transparency in vehicle diagnosis and repair, and BMW's alleged

24   misconduct is comparable to and tantamount to a violation of ARA law in this case.  Indeed,

25   BMW's failure to provide diagnostic data directly and expressly undermines a consumer's

26   ability to obtain the necessary information from the repair facility.  In these circumstances, there

27   is a particularly close nexus between BMW's misconduct and the ARA's legislative policy.

28   Concealing the data from customers is harmful to customers because it prevents them from

1    being able to have transparency with regard to automotive repairs, prevents them from being

2    able to determine if they should have to pay for repairs, and prevents them from being able to

3    determine if they are being treated fairly, both by BMW and by BMW's servicing dealerships.

4         85.    In fact, the very reason why Plaintiff needs her data is to determine if her vehicle

5    was damaged by Weatherford BMW, a vehicle dealership acting as an agent of BMW.  The

6    whole point of the ARA is to ensure that consumers are not mistreated by vehicle dealerships.

7    Here, Plaintiff contends that Weatherford BMW has mistreated her, in that Weatherford has

8    damaged her vehicle, and refused to pay for the repairs needed. The only way that Plaintiff can

9    be protected from said mistreatment is through compliance with the policies underpinning the

10   ARA.  But even Weatherford BMW cannot fully comply with its statutory obligations pursuant

11   to the ARA, because only BMW has the actual data that would be needed in order to fully

12   comply. This intrusion by BMW into the servicing of vehicles is by BMW's own design, and is

13   actually intended, either by design, or indirectly, to circumvent the dealership's obligations, and

14   the consumers' rights.

15        86.    As a result, Plaintiff is being unfairly denied the very information that the law

16   intends that Plaintiff have access to, information needed to prevent Plaintiff from being taken

17   advantage of by Weatherford BMW.  Denial of such information is clearly unfair.

18                                Unlawful Prong

19        87.    BMW's practiced also is unlawful in violation of the UCL.

20        88.    A business practice is "unlawful" under the UCL if it is forbidden by law or

21   regulations, including standard of professional conduct. The violation of any law or regulation

22   may serve as the predicate for a violation of the "unlawful" prong of the UCL.

23        89.    BMW's conduct violates various California statutes that require BMW to make

24   the requested data available, including California Health & Safety Code section 43105.5,

25   California Code of Regulations section 3356(a)(2)(A), and the California Computer Data

26   Access and Fraud Act ("CCDAF").

27

28

90.     Pursuant to California Health & Safety Code section 43105.5, BMW was required to make certain diagnostic equipment available to the independent repair facility, and BMW did not do so.

91.     California Health & Safety Code section 43105.5 requires that, if a problem exists that could cause a vehicle to fail a smog test, the manufacturer must make the diagnostic data available by offering repair facilities the emissions-related diagnostic tools necessary to diagnose the problem.

92.     The records from the repair of Plaintiff's vehicle in May 2019 indicate that fault codes were present for, among other problems, the thermal oil level sensor and that there was no message from the transmission control unit, both of which problems could give rise to the vehicle failing a smog test.  At the very least, these fault codes are evidence of some fault code relating to a system of the vehicle which effects emissions. Thus, as a matter of law, BMW had an obligation pursuant to California Health and Safety Code section 43105.5 to make diagnostic equipment and resulting data available to the authorized independent repair facility to perform a smog test, regardless of whether or not a smog test was actually requested.  BMW did not do so.

93.     BMW failed to make the diagnostic equipment and data available to A&E Automotive Sales, Inc., which was unlawful, and prevented the independent repair facility from being able to access the vehicle's data, resulting in Plaintiff having to take her vehicle to a BMW authorized repair facility where BMW ultimately performed repairs as alleged below and charged Plaintiff $1,997.52 to perform the repairs.

94.     Ironically, precisely because BMW has not made the diagnostic equipment and resulting data available, including the data necessary to confirm or disprove whether a smog test should have been performed on Plaintiff's vehicle at the independent repair facility, BMW cannot disprove Plaintiff's claim that a smog check would have been required. To the contrary, BMW's unlawful failure to provide the equipment so that the independent dealer could perform a smog check and access and analyze the diagnostic data resulted in Plaintiff being unable to obtain the data she needs as alleged herein.

95.     Further, California Code of Regulations section 3356(a)(2)(A) requires that a customer's repair invoice describe and identify "all service and repair work performed, including *any diagnosis* or warranty repairs, and the prices for each." (Emphasis added.) BMW does not provide repair facilities with the content relating to the diagnostic information that BMW collects.

96.     BMW dictates uniform policies at the corporate level and implements them to all of its authorized repair facilities throughout California. BMW's authorized repair facilities have no independent discretion to deviate from these policies, which they are compelled to follow. On information and belief, BMW has implemented a policy at the corporate level of preventing Plaintiff and other Class members from obtaining all of the diagnostic information that BMW collects from Class Vehicles. BMW ensures its authorized repair centers comply with this policy by failing to provide its own authorized repair centers with access to all of the diagnostic information BMW collects. BMW's uniform and systematic corporate policy of forcing its authorized repair centers to withhold diagnostic information from Plaintiff and other Class members is unlawful.

97.     Further, BMW's authorized repair centers act as BMW's agents, and BMW has ratified their withholding of diagnostic information from Plaintiff and other Class members. Therefore, by preventing the dealerships from complying with this law, BMW also is violating the law.

98.     Defendant's conduct also is unlawful under the UCL in that it violates the California Computer Data Access and Fraud Act ("CCDAF"), Cal. Pen. Code, *inter alia*, sections 502(c)(1) and (5) which provide for a civil action for violation of its terms, as set forth herein.

99.     Under California Penal Code § 502(c), it is unlawful if any person:

(1)     Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;

(5)    Knowingly and without permission . . . causes denial of computer services to an authorized user of a computer, computer system, or computer network.

100.    Here, BMW knowingly, and without Plaintiff's permission, used the computer in Plaintiff's vehicle to obtain diagnostic data without providing the data to Plaintiff.  Further, BMW denied Plaintiff and BMW's authorized and independent repair facilities access to the diagnostic data extracted, which was required to service Plaintiff's vehicle. Regardless of the legitimate purpose for which BMW originally obtained the information or for which Plaintiff originally consented, BMW acted unlawfully in failing to provide the diagnostic information to Plaintiff.  Plaintiff did not consent to such behavior by BMW.

101.    The safe harbor provision of the CCDAF does not apply here because BMW's failure to provide the diagnostic data is not "within the scope of" any "lawful employment," and is not an act which is "reasonably necessary to the performance" of BMW's work assignment.

102.    Defendant's conduct also is unlawful under the UCL in that it constitutes conversion, as alleged below.

103.    Defendant's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief.   Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. § 1021.5.

## SECOND CLAIM FOR RELIEF

### Conversion

104.    Plaintiff re-alleges and incorporates by reference each allegation set forth above.

105.    Plaintiff and Class members were the owners, and had the right to possess, data collected from Class members' vehicles, including, but not limited to, "fault tests" or similar reports or information stored by BMW relating to the diagnostic testing of their vehicles, self-healing codes, FASTA data, ISTA reports or other operational reports relating to the diagnostic work and repair work performed by BMW dealerships for Class members.

106.    BMW, by intentionally refusing to provide to Plaintiff and Class members all the data gathered relating to the diagnostic testing of their vehicles, has prevented Plaintiff and

Class members from having access to their own property and refused to return the property upon Plaintiff's demand. Such unjustifiable refusal to return Plaintiff's and Class members' property is unlawful.

107.    The data collected from Class members' vehicles constitutes personal property that has independent value to Plaintiff and Class members because it is necessary for consumers to independently determine if certain malfunctions and defects should be covered under BMW's factory warranty, or if certain malfunctions and defects were caused by a servicing dealership.

108.    As the result of BMW's wrongful conduct, BMW has interfered with Plaintiff's and Class members' rights to possess and control such property, to which they had a superior right of possession and control at the time of conversion.

109.    As a direct and proximate result of BMW's conversion, Plaintiff and the Class members suffered injury, damage, loss or harm and therefore seek compensatory damages.

110.    In converting the data collected from Plaintiff's and Class members' vehicles, and intentionally refusing to provide to Plaintiff and Class members all the data gathered, BMW has acted with malice, oppression, and conscious disregard for the Plaintiff's and Class members' rights. Plaintiff, therefore, seeks an award of punitive damages on behalf of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief and judgment against BMW as follows:

### Class Certification

1.    That this case be certified as a class action;

2.    That Plaintiff be appointed as the representative of the Class; and

3.    That counsel for Plaintiff be appointed as class counsel.

### As to the First Claim for Relief

1.    That the Court declare, adjudge, and decree that BMW violated California Business and Professions Code section 17200, *et seq*. (the "UCL");

2.     For injunctive relief, including an order and declaration, on behalf of the Class, requiring BMW to provide:

    (a)    All data relating to each Class Members' vehicle;

    (b)    All diagnostic testing relating to each Class Members' vehicle;

    (c)    All data relating to any self-healing fault codes for each Class Members' vehicle;

    (d)    All FASTA data relating to each Class Members' vehicle;

    (e)    All key data reports relating to each Class Members' vehicle;

    (f)    All short tests relating to each Class Members' vehicle; and

    (g)    All ISTA reports relating to each Class Members' vehicle.

3.     For restitution resulting from BMW's conduct;

4.     For attorneys' fees and costs pursuant to, *inter alia,* C.C.P. § 1021.5 and/or CCDAF § 502(e)(2); and

5.     For such other and further relief as the Court may deem appropriate.

### As to the Second Claim for Relief

1.     For equitable relief enjoining BMW from engaging in the wrongful conduct complained of herein pertaining to the misuse of Plaintiff's and Class Members' data;

2.     For injunctive relief, including an order and declaration, on behalf of the Class, requiring BMW to provide:

    (a)    All data relating to each Class Members' vehicle;

    (b)    All diagnostic testing relating to each Class Members' vehicle;

    (c)    All data relating to any self-healing fault codes for each Class Members' vehicle;

    (d)    All FASTA data relating to each Class Members' vehicle;

    (e)    All key data reports relating to each Class Members' vehicle;

    (f)    All short tests relating to each Class Members' vehicle; and

    (g)    All ISTA reports relating to each Class Members' vehicle.

3.     For damages resulting from BMW's conduct;

1     4.     For an award of punitive damages;

2     5.     For attorneys' fees and costs pursuant to, *inter alia,* C.C.P. § 1021.5 and/or

3   CCDAF § 502(e)(2); and

4     6.     For such other and further relief as the Court may deem appropriate.

5                                    **DEMAND FOR JURY TRIAL**

6          Pursuant to Federal Rules of Civil Procure, Rule 38(b), Plaintiff hereby demands a trial

7   by jury as to all claims so triable.

8

9   Dated: August 30, 2019                          Respectfully submitted,

10                                                   **POMERANTZ LLP**
                                                     **THE LAW OFFICE OF ROBERT L. STARR**
11

12                                          By: _____

13                                                   Jordan L. Lurie
                                                     Ari Y. Basser
14

15                                                   *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28